1    JOSEPH T. MCNALLY
      Acting United States Attorney
2    LINDSEY GREER DOTSON
      Assistant United States Attorney
3    Chief, Criminal Division
      SCOTT PAETTY (Cal. Bar No. 274719)
4    Assistant United States Attorney
      Deputy Chief, Major Frauds Section
5        1100 United States Courthouse
         312 North Spring Street
6        Los Angeles, California 90012
         Telephone: (213) 894-6527
7        Facsimile: (213) 894-6269
         E-mail:   scott.paetty@usdoj.gov

8

9    Attorneys for Plaintiff
      UNITED STATES OF AMERICA

10

              UNITED STATES DISTRICT COURT
11
          FOR THE CENTRAL DISTRICT OF CALIFORNIA
12

13   UNITED STATES OF AMERICA,     No. CR 23-47-JLS-2
                                  CR 23-24-JLS-1
14          Plaintiff,

15            v.             GOVERNMENT'S SENTENCING POSITION;
                               DECLARATION OF SCOTT PAETTY;
16   CHRISTOPHER KAZUO KAMON,     SEALED EXHIBIT

17          Defendant.         Hearing Date: April 11, 2024
                               Location:     Courtroom of the
18                                               Hon. Josephine L.
                                              Staton

19       Plaintiff United States of America, by and through its counsel

20   of record, the Acting United States Attorney for the Central District

21   of California and Assistant United States Attorney Scott Paetty,

22   hereby files its sentencing position for defendant Christopher Kamon

23   in the above referenced cases.

24       This position is based upon the attached memorandum of points

25   and authorities, the presentence report, the testimony and exhibits

26   introduced during the 13-day trial of co-defendant Thomas Vincent

27   Girardi, the declaration of Scott Paetty and accompanying exhibit,

28

1

1  the files and records in this case, and such further evidence and

2  argument as the Court may permit.

3  Dated: March 28, 2025          Respectfully submitted,

4                                 JOSEPH T. MCNALLY
                                   United States Attorney

5
                                   LINDSEY GREER DOTSON
6                                  Assistant United States Attorney
                                   Chief, Criminal Division
7

8                                        /s/
                                   _____
                                   SCOTT PAETTY
9                                  Assistant United States Attorney

10                                 Attorneys for Plaintiff
                                   UNITED STATES OF AMERICA

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

## Contents

TABLE OF CONTENTS....................................................i

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.   INTRODUCTION...................................................1

II.  DEFENDANT'S OFFENSE CONDUCT AND CRIMINAL CONVICTIONS...........2

         1.   Defendant's Background as Head of Accounting at
              Girardi Keese......................................2

     B.  The Main Fraud Scheme...................................4

         1.   Victim 1..........................................4

         2.   Victim 2..........................................5

         3.   Victim 3..........................................6

         4.   Victim 4 and 5....................................6

         5.   Victim V.A........................................6

     C.  The Side Fraud Scheme...................................7

III. RESPONSE TO THE PSR...........................................8

     A.  Guidelines Calculations.................................8

     B.  The Government's Response to the PSR....................9

         1.   Defendant Should Receive a +20 Loss Enhancement
              Pursuant to the Plea Agreement....................9

         2.   Defendant Should Not Be Given a Two-Point
              Reduction for Zero-Point Offender.................10

     C.  Government's Response to Defendant's Objections to the
         PSR....................................................13

         1.   Defendant's Criminal Conduct Groups For
              Guidelines Purposes...............................13

         2.   Defendant's Challenge to the PSR's Loss
              Calculations Lack Merit...........................14

IV.  SECTION 3553(a) FACTORS......................................17

         1.   Nature and Circumstances of the Offense (18
              U.S.C. § 3553 (a)(1)).............................18

i

        2.    History and Characteristics of the Defendant (18
              U.S.C. § 3553 (a)(1))..............................19

        3.    Seriousness of the Offense, Respect for the Law,
              Just Punishment, and Deterrence (18 U.S.C. § 3553
              (a)(2)..............................................20

        4.    The Kinds of Sentences Available, the Sentencing
              Range Established by the Sentencing Guidelines,
              and the Need to Provide Defendant Necessary
              Medical Care and Avoid Unwarranted Sentence
              Disparities (18 U.S.C. §§ 3553(a)(2), (3), (4),
              and (6))............................................21

V.    RESTITUTION AND FORFEITURE..................................22

VI.   CONCLUSION..................................................23

# TABLE OF AUTHORITIES

## CASES

Gall v. United States,
        552 U.S. 38 (2007).............................................17

Molina-Martinez v. United States,
        136 S. Ct. 1338 (2016).......................................17

United States v. Callaway,
        762 F.3d 754 (8th Cir. 2014).................................16

United States v. Carty,
        520 F.3d 984 (9th Cir. 2008).................................17

United States v. Chung,
        No. 19-CR-00302-JSW-1, 2024
        WL 4609597, at *2 (N.D. Cal. Oct. 29, 2024)..................10

United States v. George,
        949 F.3d 1181 (9th Cir. 2020)................................11

United States v. Pham,
        545 F.3d 712 (9th Cir. 2008) ................................15

United States v. Rita,
        551 U.S. 338 (2007)..........................................17

United States v. Stochel,
        901 F.3d 883 (7th Cir. 2018).................................16

## STATUTES

18 U.S.C. § 3553.......................................................passim

## SENTENCING GUIDELINES

U.S.S.G. § 2B1.1.............................................11, 13, 15

U.S.S.G. § 3A1.1...................................................11

U.S.S.G. § 3B1.1...............................................11, 16

U.S.S.G. § 3D1.1...................................................16

U.S.S.G. § 3E1.1...................................................16

U.S.S.G. § 4C1.1...................................................13

iii

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.    INTRODUCTION**

3       Defendant Christopher Kazuo Kamon ("defendant" or "Kamon")

4   played an essential role in the long-running fraud scheme lead by co-

5   defendant Thomas Girardi ("Girardi").  As the head of accounting at

6   Girardi Keese for nearly two decades, defendant was the gatekeeper of

7   the firm's bank accounts and enabled Girardi's manipulation of those

8   accounts and lies to the firm's clients about their settlement funds.

9   Defendant facilitated Girardi's use of stolen client funds to pay

10  extravagant personal expenses and make Ponzi-like payments to other

11  clients and vendors in a doomed effort to keep Girardi Keese afloat

12  until the house of cards fell in late 2020.  Time and time again,

13  defendant looked the other way when Girardi instructed defendant to

14  steal client funds.  But Kamon did more than just aid and abet

15  Girardi in the theft of client funds from the firm's trust accounts.

16  Despite making hundreds of thousands of dollars in yearly salary,

17  defendant conceived, directed, and concealed a separate fraud scheme

18  that pilfered millions of dollars from the firm's operating accounts,

19  over which defendant had control.

20      Kamon's brazen side fraud, engineered to fund his own lavish

21  lifestyle evinces the same cynical, devious, and cavalier approach

22  exhibited by Girardi that ultimately destroyed Girardi Keese.

23  Defendant has pleaded guilty to two wire fraud counts related to

24  these schemes.  He also faces criminal charges in Chicago for similar

25  conduct in that jurisdiction.  Although there is no evidence that

26  defendant lied to Girardi Keese clients like co-defendant Girardi

27  did, defendant's criminal conduct was integral to the scheme and

28

caused irreparable damage to Girardi Keese clients and ultimately hastened the demise of Girardi Keese.  This conduct warrants a significant custodial sentence.

Therefore, consistent with the plea agreement in this case, for defendant's role as an aider and abettor to Tom Girardi in case number 23-47-JLS (the "main fraud scheme"), for his role in devising and carrying out the fraud scheme in case number 23-24-JLS (the "side fraud scheme"), and for the following reasons, the government submits that a sentence that includes 121 months imprisonment, a restitution order in the total amount of $8,903,324.26, three years of supervised release, and a special assessment of $200 is justified and appropriate.

## II.  DEFENDANT'S OFFENSE CONDUCT AND CRIMINAL CONVICTIONS

The following summary of defendant's offense conduct is based on facts stated in the presentence report ("PSR") ¶¶ 18-100.[1]

### 1.    Defendant's Background as Head of Accounting at Girardi Keese

Although defendant had no formal training in accounting, he was head of the accounting department at Girardi Keese from 2004 to December 2020 when the firm closed and was forced into bankruptcy. Kamon acted as defendant's right-hand man when it came to the management the firm's bank accounts, finances, and record keeping related to the firm's clients and the money that was owed them. Defendant had access to and awareness of all firm bank account

---

[1] Facts taken from sources other than the PSR are noted in separate parenthetical citations.  Defendant's criminal conduct in both the main fraud scheme and the side fraud scheme was also the subject of extensive testimony and other evidence during the 13-day trial of co-defendant Girardi.

balances, including its attorney-client trust accounts at Nano Bank
and Torrey Pines Bank.  Defendant also had signatory authority and
control over the Girardi Keese operating accounts.  Girardi dictated
which clients would be paid, how much they would be paid and when,
and Girardi signed all checks from the client trust accounts;
however, these transactions required defendant's involvement to
execute.  If Girardi had a question about account balances or
payments due to clients or other vendors, Girardi went to defendant.

During Girardi's recent criminal trial a witness from the
accounting department, N.R., testified that Girardi called defendant
"my guy in accounting".  (Dkt. 377 at 26.[2])  Girardi would contact
defendant each morning and asked for the balances of the firm's bank
accounts, including the trust accounts.  When the firm's operating
accounts were running low, defendant would inform Girardi, who would
instruct defendant to take money from the firm's client trust
accounts and send it to the operating accounts.  Girardi would
identify what case to debit the funds from and tell defendant to code
the transfer as "attorney's fees".  If defendant informed Girardi
that fees had already been taken from the case, Girardi would tell
defendant to "do it anyways".  Although defendant knew that the trust
accounts should be used to promptly pay clients and draw the firm's
fees and costs from those client settlement funds when appropriate,
defendant knew that a common practice at Girardi Keese was for
Girardi to tell defendant to transfer attorney's fees from a case in
which fees had already been taken.  N.R. said that she never heard

---

[2] Pagination refers to the CM/ECF header.

1  defendant refuse to carry out an order regarding money transfers
2  given to him by Girardi.  (Dkt. 377 at 34.)
3      **B.   The Main Fraud Scheme**
4      Co-defendant Girardi was the architect and driver of the main
5  fraud scheme in which client settlement funds would be
6  misappropriated after Girardi made an assortment of
7  misrepresentations and/or material omissions to the clients, such as
8  misrepresenting and omitting the true value of the settlement, lying
9  about reasons for delaying payment, and then using the money for
10  other purposes.  These improper purposes included making Ponzi-like
11  payments to other Girardi Keese clients whose settlement funds had
12  already been stolen, paying the firm's payroll and other expenses,
13  and paying personal expenses for Girardi, other Girardi Keese
14  attorneys, and defendant.  Although Girardi led the main fraud
15  scheme, defendant played an integral and essential role.  The charged
16  conduct focused on the theft of settlement funds related to five
17  clients in four cases.[3]  These cases are discussed in detail in
18  paragraphs 28 to 51 of the presentence report and on pages 8-11 of
19  the government's sentencing position for co-defendant Girardi (Dkt.
20  419).  Relevant facts pertaining to defendant's involvement in the
21  four charged cases are discussed below.
22          1.   Victim 1
23      Victim 1 was badly burned in a gas explosion that killed his
24  girlfriend and destroyed his home.  After Girardi's initial lie to
25  Victim 1 and his family about the true value of their settlement
26  (Girardi told them the case settled for just over $7 million when the

27  ───────────────

28      [3] An additional victim, V.A., was also identified as discussed
in PSR ¶¶ 52.

1  true value was $53 million), a wire for $28 million was sent to the
2  Torrey Pines trust account.   Defendant received notice of that
3  payment.   Instead of paying Victim 1 and his family the money they
4  were due, those funds were used to pay other firm clients.   Defendant
5  then aided and abetted Girardi in the fraud against Victim 1 by
6  sending, at Girardi's direction, a series of lulling payments
7  purportedly sourced from a separate interest bearing account that
8  defendant well knew did not exist.   Nearly six years later, after
9  years of efforts by Victim 1 and his family to get paid the money
10 they were owed, defendant, at Girardi's direction, sent a $2.5
11 million check sourced from a different client's settlement funds to
12 Victim 1.

13            2.   <u>Victim 2</u>

14      Victim 2 was a widow whose husband died in a boating accident.
15 Girardi Keese received a $504,400 settlement check for Victim 2's
16 wrongful death claim.   At Girardi's direction, defendant transferred
17 approximately $183,000 from the Torrey Pines trust account to a
18 Girardi Keese operating account and coded it as "fees" when defendant
19 knew that attorney's fees on Victim 2's case had already been taken
20 out.  (<u>See</u> Trial Ex. 245, Victim 2 Case Card Register.)   Defendant
21 then used those funds to pay the firm's payroll and wrote a $50,000
22 check to Girardi which was used to make payments to two exclusive
23 golf country clubs.   Defendant further aided and abetted Girardi's
24 efforts to defraud Victim 2 by sending a series of lulling payments
25 to her comprised of funds sourced from other client settlements, not
26 her own.

27

28

3.    <u>Victim 3</u>

Victim 3 retained Girardi Keese to represent her in a defective medical device claim.  After receiving Victim 3's $128,250 settlement into the Torrey Pines trust account, defendant aided and abetted Girardi in the theft of those funds by using those funds to pay for leases of luxury cars, instead of paying Victim 3.  Victim 3 to this day has never received any money from Girardi Keese.  (Dkt. 366 at 63.)

4.    <u>Victim 4 and 5</u>

Victims 4 and 5 retained Girardi Keese to represent them in a lawsuit related to a car accident that injured them and killed their minor son.  Prior to the initial $4 million payment on a $17.5 million settlement being received into the Nano Bank trust account, Girardi instructed defendant to take an improper "advance" on those funds and transfer them to the firm's operating account to pay firm expenses, even though defendant knew that those funds belonged to other clients.  At Girardi's direction, defendant later caused a $2.5 million check comprised in large part of Victims 4 and 5's settlement funds to be paid to Victim 1, whose settlement funds had already been stolen as described above.  In addition to these acts, defendant, again at Girardi's direction, sent a series of incremental lulling payments to Victims 4 and 5, which represented on a fraction of the total settlement due them.

5.    <u>Victim V.A.</u>

An additional victim, V.A., retained Girardi Keese to represent her in a claim related to her injuries in a car accident.  (<u>See</u> PSR ¶ 52.)  The case settled for approximately $6 million.  After attorney's fees and costs, V.A. was to be paid approximately $3

6

1   million.  After failing to pay V.A. the money owed to her, Girardi

2   and defendant caused a series of lulling payments that resulted in a

3   balance due to V.A. of approximately $1.2 million.

4        **C.    The Side Fraud Scheme**

5        As described above, defendant acted as a de facto apprentice to

6   Girardi's main fraud scheme for nearly a decade.  Additionally,

7   beginning at least as early as 2013 and continuing until Girardi

8   Keese closed in December 2020, defendant orchestrated a brazen theft-

9   within-a-theft, side fraud designed to steal money from Girardi

10  Keese.  (See PSR ¶¶ 53-59.)  Using his position as head of accounting

11  with privileged access to and control over the firm's operating

12  accounts, defendant embezzled funds from the firm's operating

13  accounts to enrich himself and others.  To carry out the scheme,

14  defendant recruited co-schemers such as I.B. and N.R. to pose as

15  purported vendors.[4]  At defendant's direction, I.B. submitted

16  numerous fake invoices to Girardi Keese, which defendant paid out of

17  the firm's operating accounts.  Defendant concealed these fake

18  invoices by referring to them as payment for work purported done by

19  I.B. for the benefit of Girardi Keese.  In truth, however, these

20  payments were for construction projects on defendant's personal

21  residences in Palos Verdes and Encino, California.  I.B. also paid

22  defendant cash kickbacks related to these payments that generally

23  amounted to approximately $10,000 each.

24       Defendant also paid N.R., a former girlfriend, $20,000 per month

25  out of the Girardi Keese operating account and attempted to conceal

26  those payments by calling the girlfriend a "legal marketer" when in

27  _____

28       [4] Both I.B. and N.R. testified at the trial of co-defendant
     Girardi.  (See Dkt. Nos. 371 at 206-232, 372 at 13-29 & 120-158.)

fact she did no work for Girardi Keese at any time.  To conceal this arrangement, defendant instructed N.R. to create register a shell company N.M., Inc. and open a bank account for the business, into which defendant could deposit the monthly checks.

## III. RESPONSE TO THE PSR

### A.    Guidelines Calculations

The United States Probation & Pretrial Services Office ("Probation") calculated defendant's total offense level as 32 based on the following factors:  base offense level of 7 under U.S.S.G. § 2B1.1 (a)(1), plus an 22-level increase for a gain of more than $25,000,000 but less than $65,000,000 pursuant to § 2B1.1 (b)(1)(L), a two-level enhancement for substantial financial hardship under § 2B1.1(b)(2)(A), a two-level enhancement for sophisticated means under § 2B1.1(b)(10), a two-level enhancement for vulnerable victim under § 3A1.1(b)(1), and a two-level enhancement for his role as a leader/organizer of the side fraud scheme under § 3B1.1(b)(1).  These calculations result in an adjusted offense level 37.  (PSR ¶¶ 106-125.)  After adjustments for zero-point offender (-2) and acceptance of responsibility (-3), defendant's total offense level was reduced to 32.  (PSR ¶¶ 129-134.)

Based on a total offense level of 32 and a criminal history category of I, Probation calculated defendant's guidelines range as 121 to 151 months.  (PSR ¶ 192.)  In its disclosed recommendation letter, Probation recommended a custodial sentence of 121 months to be followed by three years of supervised release, and a restitution order in the amount of $2,310,247.26 in the main fraud scheme (23-CR-47-JLS-2) and $6,593,077 in the side fraud scheme (23-CR-24-JLS). (Dkt. 440.)

8

1    The government agrees with Probation's conclusion that the total

2    offense level is 32 but reaches that level by slightly different

3    calculations, as discussed below.  The government concurs in

4    Probation's restitution calculations.

5        **B.   The Government's Response to the PSR**

6        The government recommends that defendant be given the benefit of

7    the bargain in the plea agreement, which caps defendant's guidelines

8    loss enhancement at +20 (for loss between $9.5 million and $25

9    million) and also recommends that defendant not be granted a zero-

10   point offender reduction because his offense conduct caused

11   substantial financial hardship to victims of the main fraud scheme

12   and to Girardi Keese, the victim of the side fraud scheme.

13        1.   Defendant Should Receive a +20 Loss Enhancement

14             Pursuant to the Plea Agreement

15       The parties agreed in the plea agreement to a loss range between

16   +18 and +20.  (Dkt. 398 ¶ 13.)[5]  Defendant agreed that the loss is

17   "at least $3.5 million and reserves the right to argue that [loss] is

18   not higher than $9.5 million."  (Id.)  The government "reserves the

19   right to argue that [loss] is over $9,500,000 but agrees that it is

20   less than $25,000,000".  (Id.)  The government stands by the

21   representations in the plea agreement and recommends based on the

22   facts described supra, Section II, and the PSR ¶¶ 61-72 that the loss

23   is not over $25 million for purposes of calculating the guidelines

24   (Dkt. 398 ¶ 13).

25

26

27

28        [5] This amount did not include the additional loss related to
     Victim V.A. (PSR ¶ 73), which was confirmed after the charges in the
     above captioned cases were filed.

9

2.   <u>Defendant Should Not Be Given a Two-Point Reduction for Zero-Point Offender</u>

Defendant should not be entitled to relief under the zero-point offender section of the guidelines because his criminal conduct caused substantial financial hardship to victims of the main fraud scheme (<u>e.g.</u>, Victims 4 and 5) and to the victim of the side fraud scheme (Girardi Keese).

A defendant with no criminal history points qualifies for a two-level decrease in his or her guidelines range provided, in relevant part, that defendant "did not personally cause substantial financial hardship."  U.S.S.G. § 4C1.1(a)(6).  In determining whether a defendant caused substantial financial hardship, courts look to Application Note 4(F) of the commentary to § 2B1.1 and the non-exhaustive factors listed therein.  Examples of such hardship are whether a victim had to make "substantial changes to living arrangements, such as relocating to a less expensive home", or was forced into bankruptcy.  U.S.S.G. § 2B1.1, comment. (n.4(F)(ii), (v); <u>see also</u> <u>United States v. Chung</u>, No. 19-CR-00302-JSW-1, 2024 WL 4609597, at *2 (N.D. Cal. Oct. 29, 2024) (citing U.S.S.G. § 2B1.1.)

Probation reasoned that defendant qualified for the reduction based on a finding that defendant did not have any communication with Victims 4 or 5 and was not necessarily aware of their particular claims.  (PSR ¶ 132.)  However, nothing in the guidelines requires such direct communication with a victim or knowledge of their individual claims as a predicate for finding that a defendant personally caused financial hardship.

In interpreting "substantial financial hardship", the Ninth Circuit has considered both "but for" and "proximate" causation.  <u>See</u>

10

1  United States v. George, 949 F.3d 1181, 1188 (9th Cir. 2020).  By

2  either measure, defendant's personal actions caused the financial

3  hardship inflicted on Girardi Keese clients (including Victims 4 and

4  5) and on Girardi Keese.  First, defendant clearly meets the

5  "relatively undemanding" but-for standard because without defendant's

6  involvement in managing the Girardi Keese accounting department

7  during the main fraud scheme, including moving funds at Girardi's

8  direction and withholding payments from clients at Girardi's

9  direction, the main fraud would not have occurred or lasted as long

10  as it did.  See George, 949 F.3d at 1187.  Moreover, there is no

11  dispute that defendant was the mastermind of the side fraud and

12  directed all aspects of its execution, which continued "through at

13  least in or about December 2020" (Dkt. 398 at 24) until the firm

14  collapsed into involuntary bankruptcy.

15      Defendant similarly satisfies a proximate cause inquiry in both

16  the main fraud and side fraud because he (1) was aware that Girardi

17  was impermissibly withholding and misappropriating client funds (Dkt.

18  398 at 21), (2) was personally involved in the scheme to misclassify

19  stolen funds as "fees" drawn on other cases when it was improper to

20  do so and acknowledged that this practice occurred "frequently" and

21  that the pattern "got worse over time."[6] (PSR ¶ 93); (3) was aware

22  that 6.5% "interest payments" to victim 1 were based on a lie that

23  there was a $10 million annuity taken out for victim 1 (PSR ¶ 92 and

26  [6] Misappropriation of client funds occurred in the four charged
cases in the main fraud scheme, in the Lion Air case, and in other
cases as well.  (PSR 93; Trial Exs. 94 (Victim 1 case card register),

27  245 (Victim 2 case card register), 335 (Victim 3 case card register),
and 458 (Victims 4 & 5 case card register), see also Dkt. 368 at 182-

28  84 (discussing additional misappropriation of client funds) and Dkt.
377 at 60 (no 6.5% interest bearing account).

Dkt. 377 at 60); (4) knew that Girardi Keese clients (including
Victims 4 and 5) were vulnerable because they were susceptible to
Girardi's lies and "likely did not have knowledge of the legal system
and were unfamiliar with legal settlement procedures" (PSR ¶ 119);
(5) that "there was no reason for [Victim 4] to not be paid" (PSR
¶ 90); and (6) conceived of and implemented the side fraud scheme
that siphoned millions of dollars from Girardi Keese at the same time
that clients and vendors were not being paid and the firm was
teetering on the edge of insolvency (Dkt. 398 at 24-25, PSR ¶ 84).

Thus, as in George, the potential for significant adverse
consequences to victims (including Victims 4 and 5)[7] and the Girardi
Keese law firm itself, as a result of defendant's involvement in both
schemes were foreseeable to defendant.  See George, 949 F.3d at 1188.
The Court should decline to apply a -2 to defendant's guidelines
under the zero-point offender provision because defendant's conduct
caused substantial financial hardship to victims of both fraud
schemes.

Therefore, the government's proposed guidelines calculation
appears in the below table.

| Base Offense Level: | 7 | U.S.S.G. § 2B1.1(a)(1) |
|---|---|---|
| Specific Offense Characteristics: | | |
| Loss Between $9,500,000 and $25,000,000 | +20 | U.S.S.G. § § 2B1.1(b)(1)(K) |
| Substantial Financial Harm | +2 | U.S.S.G. § 2B1.1(b)(2)(A) |
| Sophisticated Means | +2 | U.S.S.G. § 2B1.1(b)(10) |

[7] Notably, in applying a +2 to defendant's guidelines for causing substantial financial hardship, Probation stated "due to Girardi and [defendant's] conduct", Victims 4 and 5 were "unable to purchase a home that they 'desperately need[ed]' and medical equipment for their paralyzed son", forcing them to stay in their current location.  (PSR ¶¶ 114-115) (emphasis added).

12

| Vulnerable Victim | +2 | U.S.S.G. § 3A1.1(b)(1) |
|---|---|---|
| Leader/Organizer | +2 | U.S.S.G. § 3B1.1(c) |
| Acceptance of Responsibility | −3 | U.S.S.G. § 3E1.1(a),(b) |
| Total Offense Level | 32 | |

This total offense level of 32 is the same as the level recommended by Probation (albeit reached by different means) and results in the same advisory guidelines range, 121 to 151 months.  In sum, for the above reasons and the reasons discussed in section IV _infra_, the government concurs with Probation that defendant should be sentenced to 121 months custody, to be followed by three years supervised release, and a restitution order of $6,593,077 in case number 23-CR-24, and $2,310,247.26, in case number 23-CR-47-2-JLS. (Dkt. 400 at 1-2; PSR ¶¶ 203-204).

**C.    Government's Response to Defendant's Objections to the PSR**

1.    Defendant's Criminal Conduct Groups For Guidelines Purposes

Defendant objects to Probation's grouping of the counts to which defendant pleaded guilty in 23-24-JLS and 24-47-JLS, on grounds that the two offenses are separate and distinct.  (Dkt. 75 (in case number 23-24) at 4-6.)  The government disagrees and concurs with Probation that defendant's counts of conviction group.

First, the Guidelines allow grouping of counts contained in different charging documents.  (See PSR ¶ 103, citing U.S.S.G. § 3D1.1, comment. (n.1.).)  Second, the main fraud scheme and the side fraud scheme involve misappropriation of funds from the same Girardi Keese bank accounts that defendant oversaw and managed as the head of the firm's accounting department.  When the firm's operating

13

accounts were "low," defendant informed Girardi who, in turn, instructed defendant to replenish the operating accounts with funds from the firm's trust accounts.  (PSR ¶ 24.)  As the Court noted in the denial of defendant's motion in limine to exclude evidence of the side fraud scheme from Girardi's trial, "the two schemes alleged in [the side fraud] case and the main case are closely aligned."  (Dkt. 235 at 5.)  Indeed, the main scheme "provided the funds used by both Defendants, including funds that facilitated Defendant Kamon's alleged side scheme."  (Id.)  Although the side fraud scheme involved thefts from the Girardi Keese operating accounts while the main fraud scheme focused on the firm's client-trust accounts, "this distinction is near meaningless in the context of these cases, which allege widespread fraud and non-compliance with accounting principles on a fundamental level."  (Id. at 6.)  In sum, the "two Defendants are alleged to have worked together in key executive positions at the same law firm, they face the same charges, the charged conduct relates to the misuse of funds in the bank accounts of the same law firm, and the alleged side scheme has a complete temporal overlap with the alleged main scheme."  (Id. at 7.)  Grouping is warranted here.[8]

> 2. **Defendant's Challenge to the PSR's Loss Calculations Lack Merit**

Defendant also challenges Probation's loss calculation in the PSR.  (Dkt. 75 at 7-8.)  Defendant's arguments against the PSR's loss findings are that they do not credit him for lulling payments and result in double counting.  Both arguments lack merit.

---

[8] Defendant also raises a "double counting" argument that is addressed in the next section.

First, as discussed in the previous section, defendant's counts of conviction are properly grouped.  Moreover, although the operating accounts were replenished with funds from the client trust accounts, the trust accounts also contained millions of dollars in commingled funds from a variety of sources including Girardi's personal funds, funds from the liquidation of Girardi real property, and loans from litigation lenders.  (PSR ¶¶ 82, 87.)  There is no double counting because Girardi Keese was entitled to more than the $6 million that defendant stole from the operating accounts in the side fraud scheme based on the attorney's fees and costs that were due to the firm from the four charged defendants in this case alone.  (See PSR ¶¶ 62 (Girardi Keese entitled to approximately $15.75 million from Victim 1), 65 ($170,000 from Victim 2), 68 ($37,000 from Victim 3), 70 ($5.95 million from Victims 4 & 5).)

Furthermore, the harm to Girardi Keese from the side fraud is separate and distinct from the harm suffered by the firm's clients due to the main fraud.  See United States v. Pham, 545 F.3d 712, 717 (9th Cir. 2008) (where victims suffer "distinct wrongs" as a result of a defendant's criminal conduct "and if accounting for those distinct wrongs is necessary to make the defendant's sentence reflect the full extent of the wrongfulness of his conduct, then we hold that it is not impermissible double counting to consider both groups as victims even if their losses are ultimately traceable to the same fraudulently obtained funds.") (cleaned up).  Here, in light of the serious consequences suffered by the two sets of victims and the need for defendant's sentence to reflect the full extent of his wrongful

15

conduct, it is not double counting, even if some illegal proceeds of the side fraud overlap with stolen client money from the main fraud.[9]

Second, although lulling payments were made to victim-clients, they were sourced from other funds, not their actual settlements, and so they should not be credited against loss for guidelines purposes. (PSR ¶ 74 n.2.)[10]  That lulling payments were made after defendant had stolen the victims' settlement funds and came after the victims made repeated efforts and requests to be paid[11] militates against such credit because such payments serve no other purpose but to prolong the fraud scheme and avoid detection, as is the case with all Ponzi schemes.  A defendant is not entitled to a credit when the defendant's objective in repaying a victim is to perpetuate ongoing fraud.  See, e.g., United States v. Callaway, 762 F.3d 754, 759-60 (8th Cir. 2014) (payments to victim were "necessary to give [defendant's] scheme a veneer of legitimacy"); see also United States v. Stochel, 901 F.3d 883, 890-91 (7th Cir. 2018) (defendant not entitled to offset where he paid some funds towards genuine receivership expenses because they were made to conceal and "were essentially the cost of perpetuating the scheme").  Therefore, there is no basis to reduce defendant's loss by the amount of lulling payments.

Finally, as discussed above, defendant should be given the benefit of his bargain related to loss in his plea agreement and,

---

[9] The government does not concede that there is any overlap in stolen funds.

[10] These lulling payments may be (and have been) counted toward defendant's restitution obligation.

[11] See Dkt. Nos. 364 at 153 (Victim 1), 364 at 240 (Victim 2), 366 at 56 (Victim 3), and 368 at 70-71 (Victim 4).

thus, the government respectfully requests that defendant's loss
amount for guidelines purposes should be limited to below
$25,000,000.  (Dkt. 398 ¶ 13.)

**IV.  SECTION 3553(a) FACTORS**

The Court should impose a sentence sufficient, but not greater
than necessary, to reflect the purposes of sentencing identified in
18 U.S.C. § 3553(a).  United States v. Carty, 520 F.3d 984, 991 (9th
Cir. 2008).  The advisory Guidelines range provides the "starting
point and . . . initial benchmark" for this Court's consideration of
an appropriate sentence.  Molina-Martinez v. United States, 136 S.
Ct. 1338, 1345 (2016) (quoting Gall v. United States, 552 U.S. 38, 49
(2007).  Although the Guidelines are not binding, they "reflect a
rough approximation of sentences that might achieve section 3553(a)'s
objectives."  United States v. Rita, 551 U.S. 338, 350 (2007).

Under 18 U.S.C. § 3553(a), in arriving at the appropriate
sentence, the Court should consider, among other factors, the nature
and circumstances of the offense and the history and characteristics
of the defendant, § 3553(a)(1); the need for the sentence imposed to
reflect the seriousness of the offense, to promote respect for the
law, and to provide just punishment for the offense, § 3553
(a)(2)(A); the need for the sentence imposed to afford adequate
deterrence to criminal conduct, § 3553(a)(2)(B); the need for the
sentence imposed to protect the public from further crimes of the
defendant, § 3553(a)(2)(C); the kinds of sentences available,
§ 3553(a)(3); and the need to avoid unwarranted sentence disparities,
§ 3553(a)(6).

17

In light of the relevant § 3553(a) factors, a 121-month custodial sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing here.

1. <u>Nature and Circumstances of the Offense (18 U.S.C. § 3553 (a)(1))</u>

Defendant's participation in two fraud schemes that resulted in tens of millions of dollars of losses to victims is serious conduct that warrants a significant custodial sentence. Defendant's complicity in the main fraud scheme enabled Girardi to perpetrate and conceal the fraud for years. Without defendant in his accounting department, Girardi would not have been able to carry on the Ponzi-like shuffle of new client money to pay old clients for nearly as long. Indeed, defendant played the part of Girardi's "guy in accounting" to the fullest. He did not raise questions and he did not object when Girardi told him to break the rules governing client trust accounts by taking out more fees than were due. When Girardi said "do it anyways", defendant did just that despite knowing that the trust account should be used to pay clients and draw only the appropriate fees and costs for the firm. (PSR ¶¶ 24, 87.) Defendant's willingness to follow Girardi's directions and withhold payments from clients in order to transfer money to the firm's operating accounts (PSR ¶ 93), and even make payments directly out of the trust accounts to pay personal expenses like jewelry or purses for Girardi's wife (PSR ¶ 89) evinces utter disregard for the welfare of the firm's clients and a desire to put Girardi's interests, and by extension his own interests, first. The devastating impact that the main fraud had on Girardi Keese victim-clients is apparent from the impact statements included with the government's sentencing position

18

for co-defendant Girardi.  (<u>See</u> Dkt. 428, Ex. 1.)  To be fair, the
fact that defendant was taking orders from Girardi, his boss and a
powerful attorney, in carrying out the main fraud is mitigating.
Moreover, there is no evidence that defendant ever directly lied to
clients, like Girardi did.  And defendant ultimately accepted
responsibility for his crimes and pleaded guilty.

But defendant's cynical side fraud, although perhaps not
unexpected (indeed defendant learned how to lie and manipulate from
the master thief——Girardi), compounds the seriousness of his criminal
conduct.  Defendant pilfered the Girardi Keese operating accounts at
the same time the firm was having financial difficulties and
defrauded clients were clamoring to be paid settlement funds that, in
some instances, had been due to them for years.  Defendant's side
fraud was motivated by greed, plain and simple, and the desire to
make extravagant expenditures for his personal benefit, including
luxury cars, renovations on two residences, private air travel,
gambling, and payments to his girlfriend.

In sum, defendant's complicity in the main fraud and willingness
to engage in a fraud-within-a-fraud compounds his culpability and
warrants a meaningful custodial sentence.

2.   <u>History and Characteristics of the Defendant (18
     U.S.C. § 3553 (a)(1))</u>

Defendant's history and characteristics evince an upbringing
where defendant had many advantages.  He had a "typical" and "normal"
childhood with close family connections and support.  (PSR ¶ 151.)
Defendant was a good student for whom "school was easy" and, although
his family encountered financial struggles, defendant had the
potential to channel his aptitude for math into a meaningful life.

But he chose another path.  Defendant's reference to his promotion to
head of accounting at Girardi Keese as a "turning point" carries with
it a bitter irony in that it coincides with his descent into criminal
activity.  Defendant's health issues and family turmoil provide
mitigating context (PSR 152-155) but ultimately are no excuse for his
criminal conduct.

In addition to his convictions in this case, defendant is
charged separately (along with Girardi and another senior Girardi
Keese attorney) with wire fraud in the Northern District of Illinois
for aiding and abetting the similar misappropriation of client
settlement funds related to the Lion Air crash.  (See United States
v. Girardi et al., case number 23-CR-54, N.D. Ill.)  That case is
still pending.

Defendant's acceptance of responsibility in this case is a
significant mitigating circumstance; however, despite agreeing to a
money judgement of forfeiture in the amount of $3.1 million,
defendant has to date opposed the Girardi Keese bankruptcy trustee's
efforts to forfeit a $2.4 million luxury residence in the Bahamas and
similarly refused to assist in the recovery of funds held in a
Bahamian bank account to satisfy that obligation.  (See Exhibit 1 to
the Paetty Declaration attached hereto; see also Dkt Nos. 2277, 2309,
and 2338, In re Girardi Keese, 20-bk-21022-BR (C.D. Cal.).)
Defendant's efforts to impede liquidation of his assets to satisfy
his pending restitution obligation are concerning and amplify the
risk of recidivism.

3.   Seriousness of the Offense, Respect for the Law, Just
Punishment, and Deterrence (18 U.S.C. § 3553 (a)(2)

The seriousness of defendant's criminal conduct, the need for

20

general deterrence, to promote respect for the law, and to provide just punishment further justify a guidelines sentence of 121 months. Defendant aided and abetted Girardi for many years and then doubled down on that crime by concocting the side fraud scheme, which was motivated solely by defendant's greed and desire to live an extravagant lifestyle.  These callous actions underscore the seriousness of defendant's offenses.

A significant sentence is also warranted here to deter individuals who oversee client-trust accounts, which are by nature (and name), the most sacrosanct bank accounts in the legal industry. Individuals, like defendant, who handle these accounts should be made aware that fraudulent conduct related to these accounts and sensitive financial information associated with them will have serious consequences.  Defendant's unwillingness to assist in the forfeiture proceedings, as discussed in the previous section, also raises the question of whether defendant is a risk for recidivism.

In sum, a sentence of 121 months is necessary to reflect the seriousness of the offense, promote respect for the law, afford adequate deterrence, and provide just punishment for defendant's crimes.

    4.    <u>The Kinds of Sentences Available, the Sentencing Range Established by the Sentencing Guidelines, and the Need to Provide Defendant Necessary Medical Care and Avoid Unwarranted Sentence Disparities (18 U.S.C. § 3553 (a)(2), (3), (4), and (6))</u>

The government's recommended sentence is within the guidelines range for defendant's criminal conduct.  Moreover, it is commensurate with the government's recommended sentence (168 months) for defendant

21

Girardi.  Defendant's involvement in the side fraud is certainly an aggravating circumstance; however, there is no evidence that defendant engaged in the elaborate and devious lies that Girardi told his clients to further the main fraud.  And, although not an excuse, the main fraud scheme provides the framework that made the side fraud possible.  Put another way, Girardi's cunning and cavalier theft of funds from the trust accounts made criminality commonplace at Girardi Keese by normalizing aberrant and abhorrent behavior.  In doing so, Girardi cultivated an environment that fostered defendant's side fraud.  To be clear, that is not a mitigating fact, but it provides context for the relative culpability of Girardi and defendant and supports the government's 121-month recommendation here.  Moreover, defendant pleaded guilty and should be afforded the benefit of his acceptance of responsibility and the agreed upon low-end guidelines sentence in his plea agreement.  The recommended sentence here will not result in unwarranted sentencing disparities when compared to the government's recommendation for co-defendant Girardi.

## V.    RESTITUTION AND FORFEITURE

Under the Mandatory Victims Restitution Act, restitution is mandatory in this case.  (PSR ¶ 203.)  The government agrees with the restitution amounts and schedule found by Probation.  (See PSR ¶¶ 109, 203-204.)  Specifically, restitution in the amount of $8,903,324.26 should be ordered, to be paid as described in the PSR.  (PSR ¶¶ 203-204.)  The United States will seek forfeiture, as alleged in the indictment, and to that end the Court has ordered a money judgment of forfeiture against defendant in the amount of $3,100,000 (Dkt. 453.)

**VI.  CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court sentence defendant to 121 months imprisonment, a restitution order in the total amount of $8,903,324.26 (divided between the two cases in which he pleaded guilty), three years of supervised release, and a special assessment of $200.

Dated: March 28, 2025                    Respectfully submitted,

                                         JOSEPH T. MCNALLY
                                         Acting United States Attorney

                                         LINDSEY GREER DOTSON
                                         Assistant United States Attorney
                                         Chief, Criminal Division


                                         _____/s/_____
                                         SCOTT PAETTY
                                         Assistant United States Attorney

                                         Attorneys for Plaintiff
                                         UNITED STATES OF AMERICA

23

Case 2:23-cr-00024-JLS    Document 80    Filed 03/28/25    Page 29 of 30   Page ID
#:699

1     The undersigned, counsel of record for the government, certifies

2  that this brief contains 5,900 words, which complies with the word

3  limit of L.R. 11-6.1.

4  Dated: March 28, 2025       Respectfully submitted,

5                          JOSEPH T. MCNALLY
                            Acting United States Attorney
6

7                          LINDSEY GREER DOTSON
                          Assistant United States Attorney
                          Chief, Criminal Division
8

9                              /s/
                          _____
10                       SCOTT PAETTY
                          Assistant United States Attorneys

11                          Attorneys for Plaintiff
                          UNITED STATES OF AMERICA
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF SCOTT PAETTY

I, Scott Paetty, being duly sworn, declare and state as follows:

1.    I am an Assistant United States Attorney with the United States Attorney's Office for the Central District of California.  I am the attorney assigned to the following cases:  United States v. Girardi et al., No. CR 23-47-JLS and United States v. Kamon, CR 23-24-JLS.

2.    Exhibit 1 is a true and correct copy of a letter from Elissa Miller, the Chapter 7 Bankruptcy Trustee of the Girardi Keese law firm.  This letter is provided to the Court pursuant to the government's obligations under the Crime Victims Rights Act.  It has been produced to defendant and Probation

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and that this declaration is executed at Los Angeles, California, on March 28, 2025.

_____
SCOTT PAETTY

1